IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION

**FILED**
**CHARLOTTE, NC**

JAN 3 0 2017

US District Court
Western District of NC

| | |
|---|---|
| LENA WATTS-ROBINSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | COMPLAINT |
| ) | JURY TRIAL DEMANDED |
| CATAWBA COUNTY BOARD ) | |
| OF EDUCATION CHAIRMAN ) | Civil Action No.: 5:17 cv 24 - (RLV) |
| M. DAVID BRITTAIN d/b/a ) | |
| CATAWBA COUNTY SCHOOLS) | |
| ) | |
| Defendant. ) | |

## I. INTRODUCTION AND JURISDICTION

1. This is an action seeking relief under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 (e) et seq., ("Title VII"), the Civil Rights Act of 1991; the Civil Rights Act of 1866, 42 U.S.C. § 1981, ("Section 1981"), 42 U.S.C. 1983 ("Section 1983"), and the common law and public policy of the State of North Carolina General Statute § 143-422.2.

2. Plaintiff's claims arise from race discrimination and retaliation acts that occurred while employed with the Defendant.

3. Plaintiff was assigned and confirmed to work, as a substitute teacher, at the Maiden Elementary School, until she complained of race discrimination.

4. After Plaintiff complained of race discrimination, Plaintiff was ordered not to report to work because she is not the "best match" for the students, even though Plaintiff was selected from Maiden Elementary School's preferred substitute teacher's list to teach the students in questioned.

1

CAD 0 40J20

5. In accordance with the Catawba County Schools policies and procedures, Plaintiff filed a Race Discrimination Complaint against Principal Lori Reed, and Jordan Goodson, a third grade teacher, of Maiden Elementary School with Catawba County Schools Human Resources.

6. Assistant Superintendent for Human Resources, L. Christopher Gibbs, reported that he conducted a thorough investigation of the complaint, and "relayed . . . the results of . . . [the] investigation" . . . to Plaintiff via telephone.

7. Assistant Superintendent for Human Resources, L. Christopher Gibbs, in his written response to Plaintiff's complaint, concluded that "[T]he principal did not deny you the opportunity to work as a substitute teacher after you made the . . . complaint and did not fill your position with Caucasian substitutes on the basis of race, but rather on the basis of who was the best fit for the students who were already out of their routine due to the regular teacher being out on maternity leave."

8. During a telephone conference with L. Christopher Gibbs, prior to his written conclusion, Plaintiff was informed that she was not allowed to work because Plaintiff had disagreed with the principal and teacher concerning the discipline of an African American student. Watts-Robinson disputed the claim that she disagreed with the principal's discipline of the student.

9. L. Christopher Gibbs also claimed that the principal and teacher were afraid Plaintiff would be unable to handle the undisciplined student, and therefore, denied Plaintiff the opportunity to work, even though Plaintiff had worked with that same undisciplined student prior to her complaint of race discrimination.

2

10. Plaintiff notified the superintendent of Catawba County Board of Education of L. Christopher Gibbs investigation.

11. Plaintiff reported that Mr. Gibbs did not thoroughly investigate Plaintiff's race discrimination complaint as Plaintiff was assured during a telephone conversation with Mr. Gibbs.

12. Dr. Matthew W. Stover, superintendent, responded to Plaintiff's letter. He stated, "I have reviewed the contents of your letter and the substances of Mr. Gibbs' investigation and have found that Mr. Gibbs thoroughly investigated this matter in compliance with the board policies and I agree with his findings and conclusions."

13. Plaintiff filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission and received a Notice of Suit Rights.

14. Jurisdiction of the court is invoked pursuant to 28 U.S.C. § 1343, this being a proceeding seeking to enforce rights and remedies secured to Plaintiff under Title VII and Section 1981. Jurisdiction is also conferred upon this court by 42 U.S.C. § 1331, by 42 U.S. C. § 2000 (e) et seq.,

15. Jurisdiction is further invoked pursuant to 28 U.S.C. § 1367, this being an action challenging Defendant's unlawful acts under the common law of public policy of the State of North Carolina.

## II. PARTIES

16. Plaintiff, Lena Watts-Robinson ("Watts-Robinson") is an African American, U.S. citizen and resident of Lincolnton, Lincoln County, North Carolina.

17. Defendant, Catawba County Board of Education Chairman M. David Brittain ("Catawba County Schools") is an educational entity and employer within the meaning of Title VII,

Section 1981, and 28 U.S.C. § 1367 under the common law of public policy of the State of North Carolina.

### III. STATEMENTS OF FACT

18. Watts-Robinson began working for Catawba County Schools in November 2015 as a substitute teacher.

19. Watts-Robinson worked throughout the county and was known to be a "great" teacher who taught and managed her students' well.

20. Principal Lori Reed told Watts-Robinson, the day after she was dismissed, that Watts-Robinson had "done a great job" at Maiden Elementary.

21. Watts-Robinson was listed on several schools' preferred substitute teachers' list, including Maiden Elementary School.

22. Watts-Robinson has, on several occasions, received direct calls from teachers at Maiden Elementary School to substitute in their classes.

23. Watts-Robinson was selected from the preferred substitute teachers' list to teach, the students in question, on May 9, May16, May 23, May 27, and May 31, 2016, at Maiden Elementary.

24. Watts-Robinson taught, the students in question, on May 9, May 16 and May 23, 2016, as assigned.

25. During the afternoon of May 23, 2016, Watts-Robinson was approached by two African American students, in her class, who asked if they could speak with her in private.

26. Watts-Robinson, escorted the children outside the classroom's door in an effort to speak with the children in private, as a classroom assistant carried on the lesson's review with the other children.

4

27. The two African American children, one male and one female, told Watts-Robinson that they were being "punished" in class for doing the same acts as their white classmates, who were not being "punished."
28. The two African American children also stated that the accused teacher, who is also African American, would, in addition to punishment, constantly "yell" at the African American children, in the presence of their predominantly white classmates, even when the children did nothing wrong, as the entire class laughed at the two African American children.
29. Watts-Robinson told the children that she would relay their concerns to the appropriate person and that someone would check into their concerns. Watts-Robinson tried to reassure the children that they would be alright and encouraged them to stay focused on their studies.
30. On the afternoon of May 23, 2016, after escorting the children to their buses, Watts-Robinson spoke with Jordon Goodson.
31. Watts-Robinson told Jordan Goodson, white male and the permanent 3rd grade teacher for the children, that two of his African American students felt that they were being discriminated against because they were being "punished" for the same acts that their white classmates committed, but their white classmates were not "punished."
32. Jordan Goodson immediately denied the children were being discriminated against.
33. Jordan Goodson also immediately blamed the two African American children of causing the problems.

34. Jordan Goodson then accused another African American child of being a part of the classroom problems because that child is undisciplined; the student's disciplinary problems, in the class, were not the reason Watts-Robinson approached Jordan Goodson.

35. Jordan Goodson informed Watts-Robinson that he, Jordan Goodson, was the only one who can "control" that undisciplined African American child because the child "hates his mother and all women."

36. Watts-Robinson replied that the child, with the discipline problems, was not functioning on a 3rd grade level, and the child's behavior is disruptive to the other children, and as an educator that troubled Watts-Robinson, a great deal.

37. Redirecting Jordan Goodson to the original issue, Watts-Robinson also told Jordan Goodson that she informed him of the children's complaint because he is the full-time teacher in the children's group, and she felt confident that the children's concerns would be addressed by the appropriate authority.

38. The very next morning on May 24, 2016, Watts-Robinson was ordered not to report to work as the substitute teacher for Jordan Goodson and Stephanie Elliott; she was out on maternity leave. Watts-Robinson was not given a reason for this sudden and unexpected dismissal.

39. After being dismissed, Watts-Robinson, in an effort to investigate why she had been dismissed as the substitute teacher for Jordan Goodson and Stephanie Elliott, called the school.

40. Watts-Robinson spoke with Principal Lori Reed who stated, we believe that you (Watts-Robinson) are not the "best match" for that group of students.

41. Watts-Robinson had taught that same group of students, prior to her complaint of race discrimination, on May 9, May 16, and May 23, 2016.

42. Principal Lori Reed also told Watts-Robinson, on May 24, 2016, that Watts-Robinson had "done a great job" at Maiden Elementary.

43. Principal Lori Reed did not speak with Watts-Robinson, prior to the dismissal, nor did Principal Lori Reed ask any questions of Watts-Robinson about her conversation with Jordan Goodson.

44. Principal Lori Reed stated that Jordan Goodson was "offended" by the conversation, but failed to tell Watts-Robinson specifically what "offended" Jordan Goodson.

45. Watts-Robinson made clear to Principal Lori Reed that the conversation between Watts-Robinson and Jordan Goodson was not initially about the undisciplined child that Principal Lori Reed spoke of, but was about two other African American children who sought out Watts-Robinson to report their concerns.

46. Watts-Robinson told Principal Lori Reed that the children felt comfortable telling Watts-Robinson about their concerns.

47. Principal Lori Reed did not ask Watts-Robinson any questions about the concerns of two African American children.

48. Watts-Robinson was dismissed and replaced by white substitute teachers whom Principal Lori Reed felt was the "best match" for the African American children who had complained of race discrimination to Watts-Robinson.

49. Watts-Robinson was dismissed, on May 24, 2016, the morning after, she complained of the possibility of the practice of race discrimination against two African American children, at Maiden Elementary School.

50. Watts-Robinson was not the "best match" for the children, after her complaint of race discrimination, even though Watts-Robinson was selected from Maiden Elementary School's preferred substitute teacher's list to teach the children, in question, on May 9, May 16, May 23, May 27, and May 31, 2016.

51. Watts-Robinson had not received any complaints from Maiden Elementary, or any other schools, concerning the proper performance of her duties, prior to her complaint of race discrimination.

52. On June 20, 2016, Watts-Robinson filed a Race Discrimination Complaint, against Principal Lori Reed and Jordan Goodson, with the Assistant Superintendent of Human Resources, L. Christopher Gibbs ("Assistant Superintendent Gibbs").

53. On June 22, 2016, the Assistant Superintendent Gibbs called Watts-Robinson and stated that he was calling to get some "information" from Watts-Robinson, after speaking with Principal Lori Reed.

54. Assistant Superintendent Gibbs stated that Principal Lori Reed had no knowledge of any claim of race discrimination concerns from the two African American children.

55. Assistant Superintendent Gibbs also stated that his initial inquiry revealed, through Principal Lori Reed, that Watts-Robinson disagreed with how the school disciplined another African American child, and therefore, was not allowed to work the remainder of the assigned and confirmed workdays.

56. Assistant Superintendent Gibbs also stated, during his inquiry, that Jordan Goodson did not feel Watts-Robinson should be allowed to teach the undisciplined child because it was not in the child's best interest.

57. Watts-Robinson disputed the claim that she disagreed with the principal's discipline of the child.
58. Watts-Robinson recommended other alternatives to assist the child in achieving the required and necessary knowledge of his grade level.
59. Assistant Superintendent Gibbs stated that he had not spoken with the accused teacher, and Watts-Robinson had disparaged the accused teacher by filing a complaint of discrimination.
60. Assistant Superintendent Gibbs told Watts-Robinson, during the June 22, 2016, telephone conference, that he would investigate her race discrimination complaint.
61. Assistant Superintendent Gibbs requested the names of the children involved and Watts-Robinson provided the names of the African American children.
62. Assistant Superintendent Gibbs, in his October 7, 2016, "findings and conclusions" letter, stated, "As you know, I contacted you on June 22, 2016[sic] and relayed to you the results of my investigation of your claims . . . ."
63. Assistant Superintendent Gibbs did not relay the results of his investigation; instead, he assured Watts-Robinson several times that the purpose of the June 22, 2016, telephone conference was to investigate the pending claim.
64. Assistant Superintendent Gibbs, in his October 7, 2016, "findings and conclusions" letter, stated that "Ms. Reed . . . informed . . . [Assistant Superintendent Gibbs] . . . that [Watts-Robinson] disagreed with how teachers were addressing discipline and behavior issues relating to the African American student and that . . . [Watts-Robinson] believed Ms. Long was not treating the other two boys fairly with regard to the other student."

65. Assistant Superintendent Gibbs also wrote that "Ms. Reed informed . . . [him] . . . [that Watts-Robinson] recklessly made . . . judgments about unfair treatment of students . . . ."

66. Assistant Superintendent Gibbs further explained that "Despite assurance from Ms. Reed and Mr. Goodson . . . that the African-American students were not being discriminated against, [Watts-Robinson] continued to voice . . . disagreement with how the African American student's behaviors were addressed, and [Watts-Robinson] did so in front of one of Mr. Goodson's collegues [sic]. This served as the basis for Ms. Reed's and Mr. Goodson's concern that it would not be in the best interest of the students if . . . [Watts-Robinson] substitute taught for two (2) previously scheduled and confirmed classes . . . ."

67. Assistant Superintendent Gibbs concluded that "the principal did not deny [Watts-Robinson] the opportunity to work as a substitute teacher . . . and did not fill . . . [the] position with Caucasian substitutes on the basis of race, but rather on the basis of who was the best fit for the students who were already out of their routine due to the regular teacher being out on maternity leave."

68. Assistant Superintendent Gibbs also concluded that Ms. Reed "made . . . [her] decision based upon the fact, that despite assurances from Ms. Reed and Mr. Goodson that the African-America [sic] students were not being discriminated against, [Watts-Robinson] continued to voice . . . [her] disagreement with how the African American student's behaviors were addressed and continued to recklessly make judgments that there was discrimination going on with regards to addressing behavior without having full knowledge of the situation. This, in Ms. Reed's opinion, was poor judgment on [Watts-Robinson's] part and not in the best interests of students."

10

69. On November 24, 2016, Watts-Robinson wrote to the Superintendent Catawba County Board of Education.

70. Watts-Robinson informed the superintendent that Assistant Superintendent Gibbs, "for approximately four months, . . . intentionally, and falsely, led . . . [Watts-Robinson] to believe that . . . [Assistant Superintendent Gibbs] was still working on the investigation."

71. Watts-Robinson also reported, "Mr. Gibbs also failed to address [Watts-Robinson] complaint; instead he intentionally changed the issue to focus only on the African American students involved, when in fact, the two African American students' complained . . . that their white classmates' received no punishment for their behavior toward the disruptive African American student, while the two African American students were punished for their behavior toward that same disruptive African American student."

72. Watts-Robinson reported to the superintendent that "Mr. Gibbs initially stated that Ms. Reed informed him that she did not know anything about a discrimination claim from the students." Ms. Reed later stated, to Mr. Gibbs, that "despite assurances from Ms. Reed and Mr. Goodson that the African-America [sic] students were not being discriminated against, [Watts-Robinson] continued to voice . . . disagreement with how the African American Student's [sic] behaviors were addressed . . . ."

73. Watts-Robinson pointed out to the superintendent that the "two conflicting" statements in relation to claims of race discrimination cannot both be true.

74. According to Assistant Superintendent Gibbs, Principal Lori Reed claimed to have no knowledge of race discrimination, during their initial conversation; but later claimed that

11

she assured Watts-Robinson "that the African American students were not being discriminated against."

75. Watts-Robinson reported to the superintendent that "Mr. Gibbs failed to conduct an objective investigation into [Watts-Robinson's] claim."

76. On December 13, 2016, Watts-Robinson received a response to her letter to the superintendent.

77. Dr. Matthew W. Stover, superintendent, stated, "I have reviewed the contents of your letter and the substances of Mr. Gibbs' investigation and have found that Mr. Gibbs thoroughly investigated this matter in compliance with the board policies and I agree with his findings and conclusions."

78. On October 13, 2016, Watts-Robinson filed a charge of race discrimination and retaliation with the Equal Employment Opportunity Commission which was signed on October 28, 2016, and a Notice of Suit Rights was mailed on November 3, 2016.

## IV. FIRST CLAIM FOR RELIEF – RACE DISCRIMINATION

79. Plaintiff re-alleges and incorporates all preceding paragraphs by reference as if completely detailed below.

80. By the actions described above, Defendant discriminated against Watts-Robinson by subjecting her to its discriminatory practices. Watts-Robinson is an African American female.

81. Watts-Robinson was dismissed, on May 24, 2016, from her assigned and confirmed workdays, immediately, after she complained of race discrimination on May 23, 2016.

82. Watts-Robinson was qualified to perform her duties as a substitute teacher.

83. Principal Lori Reed told Watts-Robinson, the day after she was dismissed, that Watts-Robinson had "done a great job" at Maiden Elementary.

84. Watts-Robinson was selected from the Maiden Elementary School's preferred substitute teacher's list to teach the students on May 9, May16, May 23, May 27, and May 31, 2016.

85. Watts-Robinson has, on several occasions, received direct calls from teachers at Maiden Elementary School to substitute in their classes.

86. Principal Lori Reed told Watts-Robinson that she was not the "best match" for the children, after Watts-Robinson complained of race discrimination, despite the fact that Watts-Robinson was originally selected from Maiden Elementary School's preferred substitute teacher's list to teach those specific children.

87. Watts-Robinson had not received any complaints concerning the performance of her duties, prior to her complaint of race discrimination, from Maiden Elementary School or any other schools.

88. Watts-Robinson was replaced by similarly situated white substitute teachers to teach the African American students that Watts-Robinson taught several times: May 9, May 16, and, May 23, 2016.

89. Defendant's action and or omission were in violation of Title VII, Section 1981, Section 1983, and North Carolina statute section 1367; and were undertaken willfully, wantonly, and with reckless disregard for Watts-Robinson federal and state protected rights, entitling her to compensatory and punitive damages in excess of $25,000.00.

## V. SECOND CLAIM FOR RELIEF – RETALIATION

90. Plaintiff re-alleges and incorporates all preceding paragraphs by reference as if completely detailed below.

91. By the action described above, Defendant retaliated against Watts-Robinson because she complained of race discrimination in violations of her civil rights.

92. On the afternoon of May 23, 2016, after escorting the children to their buses, Watts-Robinson spoke with Jordon Goodson.

93. Watts-Robinson told Jordan Goodson, white male and the permanent 3rd grade teacher for the children, that two of his African American students felt that they were being discriminated against because they were being "punished" for the same acts that their white classmates committed, but their white classmates were not "punished."

94. Jordan Goodson immediately denied the children were being discriminated against.

95. Jordan Goodson also immediately blamed the two African American children of causing the problems.

96. The very next morning on May 24, 2016, Watts-Robinson was ordered not to report to work as the substitute teacher for Jordan Goodson and Ms. Elliott.

97. Principal Lori Reed told Watts-Robinson, on May 24, 2016, that she was not the "best match" for the children, even though Watts-Robinson was personally selected from Maiden Elementary School's preferred substitute teacher's list to teach the children.

98. Watts-Robinson had also taught that same group of students, prior to her complaint of race discrimination, on May 9, May 16, and May 23, 2016.

99. Principal Lori Reed also told Watts-Robinson, on May 24, 2016, that Watts-Robinson had "done a great job" at Maiden Elementary.

100. Watts-Robinson had not received any complaints from Maiden Elementary, or any other school, concerning the proper performance of her duties, prior to her complaint of race discrimination.

101. Watts-Robinson had never been dismissed from any of her assigned and confirmed workdays, at Maiden Elementary School, until she complained of race discrimination on May 23, 2016.

102. Defendant's action and or omission were in violation of Title VII, Section 1981, Section 1983, and North Carolina statute section 1367; and were undertaken willfully, wantonly, and with reckless disregard for Watts-Robinson federal and state protected rights, entitling her to compensatory and punitive damages in excess of $25,000.00.

## VI. DAMAGES

103. Plaintiff re-alleges and incorporates all preceding paragraphs by reference as if completely detailed below.

104. As a result of the discriminatory action of Defendant, Watts-Robinson has suffered economic and non-economic damages, including past, present, future earnings, and other monetary losses, mental anguish, and pain and suffering.

## VII. EXHAUSTION OF ADMINISTRATIVE REMEDIES

105. Watts-Robinson timely filed charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") designated by the EEOC's charge number 430-2017-00105. EEOC has issued Plaintiff a Notice of Suit Right that was mailed on November 3, 2016. Watts-Robinson filed this action within ninety (90) days of receipt of the notice, and has thereby complied with all jurisdictional requirements, and has exhausted all administrative prerequisites to initiating this proceeding.

## VIII. JURY TRIAL DEMANDED

106. Watts-Robinson hereby demands a trial by jury of all legal claims asserted herein.

## IX. PRAYER FOR RELIEF

**WHEREFORE**, Watts-Robinson prays that the discrimination alleged herein be remedied in full and that the Court, after a jury trial:

1. Declare the actions complained of herein to be illegal;

2. Order that Defendant takes such steps as may be appropriate to stop the discrimination and to restore the conditions of employment as Watts-Robinson enjoyed before the discrimination occurred;

3. Award Watts-Robinson compensatory damages, including damages for mental anguish and pain and suffering;

4. Award Watts-Robinson damages for loss economic opportunities, back pay, front pay, future loss of earnings; and non-economic damages as appropriate;

5. Award Watts-Robinson punitive damages for Defendant's willfully violation of both federal and state laws; and

6. Grant such other and further relief as may be justified and necessary to afford complete relief to Watts-Robinson.

This January 30, 2017

*/s/ Lena Watts-Robinson*
Lena Watts-Robinson, Pro Se
P. O. Box 164
Lincolnton, NC 28093
704-552-0888